(No. 44056.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HOLICE BLACK *et al.,* Appellants.

*Opinion filed October 2, 1972.*

WARD, J., took no part.

GERALD W. GETTY, Public Defender, of Chicago (SHELVIN SINGER, and JAMES J. DOHERTY, of counsel), for appellants.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, ROBERT A. NOVELLE, and MICHAEL J. GOLDSTEIN, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE RYAN delivered the opinion of the court:

The defendants, Holice Black and Richard Black, who are brothers, were charged with the murder of a Chicago police officer and the armed robbery of a food store. They were tried together by a jury in the circuit court of Cook County and were found guilty of both charges. Defendant

Holice Black was sentenced to concurrent sentences of 100 to 200 years for murder and 20 to 40 years for armed robbery. Richard Black received concurrent sentences of 75 to 100 years for murder and 20 to 40 years for armed robbery. The appellate court affirmed the convictions (130 Ill.App.2d 996) and we granted leave to appeal.

On August 4, 1965, shortly before 9:30 A.M., the Treasure Island Food Store at 2540 Lawrence Avenue in Chicago was robbed by a man armed with a gun. As he was taking money from the safe, Marilyn Moline, the cashier, set off a silent police alarm. Later a shrill whistle by an accomplice was heard from the front of the store and the robber hastily departed. A policeman responding to the silent alarm stopped a man who was running across the parking lot of the store and forced him to put his hands against the wall. The robber, emerging from the store and seeing this, shot and killed the policeman. Both men were then observed fleeing through the streets and alleys in the neighborhood as will be recounted later. They then disappeared. In December, 1965, some four months after the crime, defendant Holice Black was arrested in Miami, Florida, and a few days later defendant Richard Black surrendered in Chicago.

Four eyewitnesses identified either one or both of the defendants as the men involved in the robbery and murder. Dennis Ewing, about whose testimony no question of taint has been raised, was walking on Lawrence Avenue next to the food store parking lot about 9:30 A.M. on August 4, 1965. He saw a policeman running toward the lot. Another man started to run across the lot but stopped at the officer's command and started to put his hands against the wall as directed. This man was wearing a grey fedora hat. The witness then heard a noise and as he turned he saw another man emerge from the food store with a bag in one hand and a gun in the other. When he saw the officer he raised the gun and fired, killing the officer. The witness was about ten feet from the gunman. Shortly thereafter, at

the police station, this witness identified Holice Black's picture from a book of photographs as the man who shot the policeman. Later the same day he also identified Richard Black from a picture as the other man in the parking lot who was wearing the grey fedora hat. In December he identified both defendants in different lineups and he identified both defendants at the trial. His positive identification has not been questioned by the defendants.

Marilyn Moline was the cashier of the food store. She identified Holice Black as the man who pointed the gun at her face and announced the holdup. He then entered the small cashier cage with her and proceeded to put the money in a bag he was carrying. While the robbery was in progress she was never more than three feet from him and had an excellent opportunity to observe him. After the robbery she went to the police station and identified Holice Black from photographs as the robber. She also subsequently identified him at a lineup and later at the trial. She testified that the robber was wearing a beanie-type hat. During the robbery she had seen the other man at the front of the store but was unable to identify him.

In addition to the two eyewitnesses there is substantial additional evidence which connects the defendants with the crime and corroborates the testimony of these witnesses.

A young woman testified that she had met Holice Black about 11:00 P.M. on August 3, 1965, and spent the night with him. She last saw him in his blue and white Buick at about 7:00 A.M. on August 4. At that time he was wearing a checkered shirt similar to the one that had been offered in evidence. At about 7:45 that morning a woman who lived in the vicinity of the food store saw a blue and white Buick park at the curb near her house and two Negro men get out. About 10:45 that morning a policeman investigating the crimes saw the blue and white Buick still parked where it had been left earlier. On its

windshield was a license-applied-for sticker made out to Holice Black. About 5:30 P.M. that same day Holice and Richard Black went to their cousin's home in Harvey, Illinois, and asked him to take them to Gary, Indiana, which he did. They were taken into custody over four months later as previously indicated.

On August 4, 1965, at about 9:45 A.M., a lady who lived near the food store saw two Negro men run across the street and enter the gangway between her house and an adjacent one. She walked through her house watching the two men and saw them cross her backyard and jump over her back fence. She could not identify the men but stated one was wearing a checkered shirt similar to the one in evidence. About the same time a man who lived in an adjacent block was visiting on the porch of his neighbor when he saw two Negro men emerge from the gangway next to his house, run across the street and enter another gangway. Upon investigating he discovered in his gangway a checkered shirt rolled up which he identified as the shirt in evidence. He stopped a squad car which was passing and gave the shirt to a policeman. The policeman found a beanie-type hat rolled up in the shirt and a traffic ticket in the shirt pocket. The traffic ticket was identified by a traffic officer as one he had issued to Holice Black and had taken his driver's license in lieu of bail. The officer who had recovered the rolled up shirt, upon investigating in the gangway across the street in the direction that the two men had run, found a grey fedora hat in a garbage can. The male eyewitness to the shooting in the parking lot identified the checkered shirt as similar to the one that the gunman had worn and the grey fedora hat as similar to the hat worn by the other man whom the deceased officer had stopped. The cashier, who had been the victim of the holdup, identified the beanie-type hat found in the shirt as being similar to the one the gunman had worn. Also it was established that Holice Black had worked at an auto shop next to the food store and had cashed several of his

paychecks in the store. The positive identification by the eyewitnesses coupled with the physical evidence and circumstantial evidence reviewed, when considered with the flight of the defendants after having abandoned the automobile near the scene of the crime, definitely tie Holice Black and Richard Black to the crimes with which they were charged.

Defendants did not file a motion to suppress the identification testimony of the witnesses prior to trial but on the third day of the trial filed a petition alleging that during the first and second days of trial attempts had been made by the prosecutor to have certain witnesses view the defendants in the courtroom and in the corridor. The petition contains no allegation as to suggestive pretrial identification tactics and asks no relief in relation thereto. The trial court denied the petition following argument but without hearing evidence. Defendants now contend that this was error. Had they been given the opportunity to be heard, they state that "perhaps" they could have shown even more suggestive lineup and prelineup procedures than they were able to show by way of cross-examination of the eyewitnesses during the trial. The simple answer is they did not request such a hearing. Not having done so they are not now in a position to complain of the lack of opportunity to explore the issue further.

This case having been tried prior to June 12, 1967, the date of the decisions in *Gilbert v. California, 388 U.S. 263, 18 L.Ed.2d 1178, 87 S.Ct. 1951; United States v. Wade, 388 U.S. 218, 18 L.Ed.2d 1149, 87 S.Ct. 1926;* and *Stovall v. Denno, 388 U.S. 293, 18 L.Ed.2d 1199, 87 S.Ct. 1967,* the exclusionary rule fashioned in those cases for lineup identification absent counsel does not apply, the rule being applied prospectively only. (*Stovall v. Denno; People v. Nelson, 40 Ill.2d 146; People v. Dennis, 47 Ill.2d 120.*) However, whether the identification confrontation occurred before or after *Wade, Gilbert* and *Stovall,* a defendant may allege and prove that the procedures used

were so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny the defendant due process of law. (*Stovall v. Denno, People v. Dennis.*) Had the defendants raised this issue in the trial court, they would have been entitled to present evidence to prove the issue.

Defendants complain of certain suggestive incidents which occurred after the cashier, Marilyn Moline, had identified Holice Black's picture at the police station but before she identified him in a lineup. We note however that her identification of this defendant at the police station occurred before the complained-of tactics. We also note that she had an excellent opportunity to observe this defendant and there is no indication in the record that her identification of Holice Black at the lineup or at the trial had its origin from other than her independent observation. If the witness has an adequate opportunity to observe, and there is little likelihood that the procedures used led to a mistaken identification, the conviction based on a subsequent in-court identification will not be set aside. *Simmons v. United States, 390 U.S. 377, 19 L.Ed.2d 1247, 88 S.Ct. 967; People v. Fox, 48 Ill.2d 239; People v. Nelson 40 Ill.2d 146.*

Defendants also contend that the identifications of the other two eyewitnesses were inadmissible because of suggestive pretrial procedures. These two eyewitnesses, one a check-out girl in the store and the other a female pedestrian in the parking lot, had less opportunity than Marilyn Moline, the cashier, to observe the defendants under conditions that would be conducive to an identification independent of any subsequent taint. However, as noted above, the question of pretrial identification procedures was not raised in the trial court. Constitutional questions as well as others may be waived by the absence of prior objections and the failure to preserve the same for review. (*People v. Hanna, 42 Ill.2d 323, cert. denied, 399 U.S. 929, 26 L.Ed.2d 796, 90 S.Ct.*

2229.) In light of the overwhelming evidence discussed above linking the defendants to these crimes, the admission of the unobjected-to identification testimony was harmless error beyond a reasonable doubt.

Considering defendants' petition to suppress the testimony of identification witnesses, it is their contention that the viewing of defendants in the court building rendered the witnesses' identification testimony inadmissible. Although no evidence was heard, there was a hearing on the petition at which counsel for the defense, the prosecution, and the court all expressed what, in fact, had occurred. It appears that on the first day of the trial, while a jury was being selected, three witnesses were brought into the courtroom. Defendants' counsel objected to their presence and the court ordered them to leave. The next day before the trial started two more witnesses were brought into the courtroom and upon objection by defense counsel they were asked to leave. They were then taken to an adjacent room from which position it would be possible to observe defendants as they passed through the corridor. When defense counsel again objected they were removed to another room. On the first day the defendants were in the courtroom when the witnesses appeared; however, on the second day the defendants had not been brought into the courtroom at the time that the witnesses were present, nor did they pass through the corridor while the witnesses were in the room from which the corridor could be seen. It was later developed on cross-examination of a witness that on another occasion a witness, while herself walking through the corridor, had occasion to meet the defendants who were being escorted by a bailiff.

These eyewitnesses had all seen the defendants before. In addition to seeing them at the food store, they had viewed their pictures and had seen them in the lineup. Seeing them under these circumstances in the court or the corridor cannot be said to be so suggestive as to influence the witness's testimony. Any association of the defendants

with the crime had clearly been fixed in the witnesses' minds prior to the incidents complained of. The witnesses were cross-examined at length during the trial concerning their opportunity to see the defendants at court. We find nothing that indicates that the identifications were based thereon. The trial court did not err in denying the petition. This is not to say, however, that such a viewing cannot be so impermissibly suggestive as to constitute a deprivation of due process of law.

On the date the case was set for trial defendant Holice Black presented a motion to suppress "any and all photographs, items of clothing or other matter and material taken from his home." Richard Black did not join in the motion. The prosecutor, without conceding an illegal search, represented that nothing taken from Holice Black's home would be introduced into evidence. Counsel then requested a hearing on his motion claiming that although not introduced into evidence items seized from the home could have led to other evidence. The court denied the motion and refused to grant to defendant a hearing thereon. Both defendants now contend the court committed reversible error in not granting a hearing on the motion.

We first observe that Richard Black lacks standing to raise the question in this court. He did not join in the motion in the trial court and cannot therefore claim error in this court for the denial of the same. Also, one challenging the legality of a search as a basis for suppressing evidence must allege and establish that he, himself, was the victim of an invasion of privacy and cannot claim prejudice through the use of evidence gathered as a consequence of a search or seizure directed at another. *Alderman v. United States, 394 U.S. 165, 22 L.Ed.2d 176, 89 S.Ct. 961.*

The case was set for trial for July 5, 1966. On that date defendants filed nine motions in addition to the motion to suppress.

In applying the fruit-of-the-poisonous-tree doctrine

(*Silverthorne Lumber Co. v. United States, 251 U.S. 385, 64 L.Ed. 319, 40 S.Ct. 182; Wong Sun v. United States, 371 U.S. 471, 9 L.Ed.2d 441, 83 S.Ct. 407*), which Holice Black now asserts, the courts have held that the burden is on the accused in the first instance to prove that the search and seizure was constitutionally impermissible. Once that has been established the trial court must give the accused the opportunity to prove that a substantial part of the case against him was the fruit of the poisonous tree. The State then has the opportunity to show that its proof has an independent origin. (*Nardone v. United States, 308 U.S. 338, 84 L.Ed. 307, 60 S.Ct. 266; Alderman v. United States.*) The cases have also held that the motion to suppress must be timely filed, stating that the court will not be required to interrupt trial to conduct such an auxiliary inquiry unless the accused could not have had adequate knowledge to make his claim at an earlier date. (*Nardone v. United States; Gouled v. United States, 255 U.S. 298, 65 L.Ed. 647, 41 S.Ct. 261.*) No explanation is given for the long delay in presenting the motion.

The evidence previously discussed consists primarily of physical evidence discovered prior to the alleged search and testimony of officers concerning events prior thereto and the testimony of eyewitnesses. Assuming *arguendo* that the illegal search did produce other evidence, we must examine this evidence to ascertain its possible connection with the search and its role in the trial. First, we note that the photographic identification of Holice at the police station occurred prior to any search and was made from a picture of Holice in the police files. His original photographic identification is therefore not related to the search.

Evidence which may have been discovered as a result of the search concerns primarily the identification of the checkered shirt by a witness from a cleaning establishment. From a laundry mark in the shirt, by reference to his records, he was able to identify it as belonging to a person by the name of Black and to establish the date it was

cleaned and the route from which it came. In a similar manner the grey fedora hat was identified by a hat cleaner from a number written on the hat band as having been brought to the cleaner by Holice Black. Though evidence to this effect is absent, we consider the possibility that the lead to the cleaner and the hat cleaner may have come from something found during the alleged search. However, the checkered shirt had previously been connected with Holice by the traffic ticket in the pocket. The eyewitnesses had identified the grey fedora hat as having been worn by the other man involved in the crime, Richard Black. Though Holice may have taken the hat to the cleaners, this testimony constituted evidence not against Holice but against Richard who is not involved in this motion.

In considering whether constitutional error constitutes harmless error beyond a reasonable doubt as required by *Chapman v. California, 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824,* it is not enough that the erroneously admitted evidence be considered merely cumulative or that there be other evidence in the record sufficient to support the conviction. (*Fahy v. Connecticut, 375 U.S. 85, 11 L.Ed.2d 171, 84 S.Ct. 229; Harrington v. California, 395 U.S. 250, 23 L.Ed.2d 284, 89 S.Ct. 1726.*) The inquiry of a court of review should not be as to the amount of untainted evidence as compared to the amount of tainted evidence. The focus should rather be upon the character and quality of the illegally obtained evidence as it relates to the other evidence bearing on the same issue and the court should appraise the possible impact upon the jury of the wrongfully obtained evidence. *Schneble v. Florida, 405 U.S. 427, 31 L.Ed.2d 340, 92 S.Ct. 1056.*

Assuming the evidence tracing the ownership of the checkered shirt through the cleaner to have been illegally obtained, we consider the possible impact of this evidence upon the jury to be insignificant when viewed with other evidence on this subject. The evidence obtained through the cleaner only identified the shirt as belonging

to a person named "Black," whereas, the shirt when found had a traffic ticket in its pocket which had been issued to Holice Black, and a young woman testified that about 2½ hours before the crime, Holice Black was wearing a shirt similar to the one found. In reviewing the other evidence in the record we can find no fruit of the poisonous tree that could have any impact of consequence upon the jury when viewed against the other evidence discussed above bearing upon the issues.

We believe that as stated in *Nardone v. United States* and *Alderman v. United States* a proper determination of these issues should have been made through a hearing thereon conducted in the trial court. However, our review of the evidence discloses that Holice Black is not entitled to have the case remanded to the trial court for such a hearing as in *Alderman v. United States* for, as analyzed above, the admission of evidence that may have been discovered as the result of an illegal search could only constitute harmless error beyond a reasonable doubt.

Defendants in an attempt to show prejudicial publicity in support of their motion for a change of place of trial had *subpoenas duces tecum* directed to various radio and television stations in Chicago requiring them to produce scripts and film clips used by the stations in broadcasting news concerning the homicide. The television stations moved to quash the subpoenas because of the cost involved in complying. It was demonstrated that the total cost to the television stations would be about $3,750. The court quashed the subpoenas stating: "I think we have ample sampling here from the clips we have had from the radio stations, and so forth, to give you a true picture of what publicity there was in this case." The defendants now contend that this denial constitutes an unjust discrimination against the poor. In *Draper v. Washington, 372 U.S. 487, 9 L.Ed.2d 899, 83 S.Ct. 774* the court stated: "*** the fact that an appellant with funds may choose to waste his money by unnecessarily including in the record

all of the transcript does not mean that the State must waste its funds by providing what is unnecessary for adequate appellate review." 372 U.S. at 496; see also *Mayer v. City of Chicago, 404 U.S. 189, 30 L.Ed.2d 372, 92 S.Ct. 410.*

The trial court felt that there was ample evidence presented to determine the nature of the publicity given and that it was not necessary to have the film clips. The defendants did not call the court's attention to any television news coverage more prejudicial to their cause than the newspaper and radio coverage. Neither did the *voir dire* examination of the jurors disclose the existence of such. The subpoenas of the film clips therefore assume the appearance of a fishing expedition and in the absence of a showing of the necessity for the production of the same we hold that the trial court did not err in quashing the subpoenas.

We must consider the above contention with the defendants' claim that the trial court erred in not granting their motion for a change of place of trial from Cook County or any of the adjacent counties because of the adverse publicity given to their case. The motion was taken under advisement and after a partial *voir dire* examination it was denied. Six of the twelve jurors chosen had never heard of the case. The other six jurors had heard of the incident but stated they had no opinion of the guilt of the defendants and would base their verdict solely on the evidence. Jurors need not be totally ignorant of the facts and issues involved. It is sufficient if the juror can lay aside his impression and render a verdict based on the evidence presented. *Irvin v. Dowd, 366 U.S. 717, 6 L.Ed.2d 751, 81 S.Ct. 1639; People v. Williams, 40 Ill.2d 522.*

Furthermore, we note that the defendants did not exercise three of their peremptory challenges, a fact which this court has in the past considered significant in determining whether a trial court has abused its discretion in failing to grant a motion for a change of place of trial.

(*People v. Williams, 40 Ill.2d 522, 531; People v. Sleezer, 9 Ill.2d 57.*) Additionally, the bulk of the alleged prejudicial publicity followed immediately after the homicide in August and September of 1965 and there was no coverage of the case from the time of defendants' arraignment in January of 1966 until the time of the trial six months later. Again, this lapse of time may be considered sufficient to dissipate any feeling of prejudice in the community resulting from the prejudicial publicity. (*Beck v. Washington, 369 U.S. 541, 8 L.Ed.2d 98, 82 S.Ct. 955; People v. Berry, 37 Ill.2d 329.*) There can be no constitutional infirmity in the court's denial of the defendants' motion for a change of place of trial if, in fact, they received a trial by a fair and impartial jury. In reviewing the record relating to the publicity surrounding this homicide and the trial, we can find no evidence which indicates that any member of the jury which tried these defendants was prejudiced by such publicity.

Accordingly, the judgment of the appellate court will be affirmed.

*Judgment affirmed.*

MR. JUSTICE WARD took no part in the consideration or decision of this case.