THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROOSEVELT POLLARD, JR., Defendant-Appellant.

Fifth District No. 5—84—0406

Opinion filed November 6, 1986.

HARRISON, J., dissenting.

Randy E. Blue and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Barbara Adams, State's Attorney, of Hillsboro (Kenneth R. Boyle, Stephen E. Norris, and Susan M. Young, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE JONES delivered the opinion of the court:

Defendant, Roosevelt Pollard, Jr., was convicted, following a jury trial in the circuit court of Montgomery County, of one count of murder and three counts of armed robbery. He was sentenced to 40 years' imprisonment for the murder conviction and three terms of 30 years each for the armed-robbery convictions, with all four terms to run concurrently. On appeal defendant claims that the court erred in admitting into evidence various statements he made to police while in custody and that the court considered an improper aggravating factor in sentencing.

At trial the following evidence was adduced. Four members of the

Thao family were returning to their home in Ottawa, Illinois, on December 26, 1983, after having spent Christmas in Fort Smith, Arkansas. David Thao was driving the family's light-blue four-door Buick Opel north on Interstate 55. Also in the front seat was Long, one of David's brothers. Another brother, Aly, was in the back seat with the boys' father, Reverend Xuxu Thao. Sometime around 10 p.m. David noticed a car tailgating the Thao vehicle. This other car bumped the back of the Thao car. David changed lanes to allow the other car to pass, but it did not. David pulled over to the shoulder of the highway and stopped. The other car stopped as well, parking in front of the Thao vehicle. David testified that three or four black men got out of the car. The men robbed the Thaos at gunpoint, taking David's wallet, his father's wallet, a tape player and some cassettes, and several items from Long's pockets. While this was happening, David heard a shot. Aly had been shot in the head behind his right ear and died shortly thereafter from the wound.

David further testified that Long was forced to kneel outside the car and was struck on the head with a gun. David also stated that one of the men pointed a "long gun" at his own neck during the incident. When the men got back into their car to leave, David and Long were able to see the license number and wrote it down. They had noted the license plate as reading YNZ861. David was not able to give a description of the attackers.

Long Thao substantially corroborated the testimony given by David. He stated there were four or five black men who got out of the other car and that they were young and skinny, but he could not describe them further. Long confirmed he was hit on the head with a gun. He stated the men searched his pockets and took, among other things, a check stub and a picture of a girl he knew.

Reverend Thao, the boys' father, testified through an interpreter, the family being originally from Laos. He also substantially corroborated David's testimony. Reverend Thao testified that the men pointed guns at David and Long and also aimed guns at himself and Aly. He stated that Aly was shot by a man with a very small gun, a revolver. Reverend Thao saw four men involved in the attack. He was able to identify Claude Kilbert as being the man who shot Aly, but he did not identify defendant as being involved.

None of the victims identified defendant as participating in the murder and robbery. The State attempted to show defendant's involvement through circumstantial evidence and defendant's statements to police.

Kenneth Wich, Jr., was driving a truck on Interstate 55 on the

night of the incident when he noticed a car being driven erratically. The car's headlights were being flashed on and off. The car would change lanes, pass his truck, and then slow down, staying in the vicinity of Wich's vehicle. Wich eventually drove into a weigh station near Litchfield, and the car followed. He described it as a dark-colored Pontiac which looked like a Grand Prix. A black man in the front passenger seat rolled down the window and talked to Wich for a few minutes. Then the car left. Wich stayed at the weigh station 15 to 20 minutes and then resumed his trip. Later, while driving on the interstate, he saw a small car with its emergency flashers on. Two men were outside the vehicle. He then saw the Pontiac he had encountered earlier parked in front of the small car. Wich testified that one of the men appeared to be leaning into the back seat of the small vehicle and that this person had something in his left hand. Wich did not stop, but, being concerned about what he had seen, he attempted unsuccessfully to summon help on his C.B. radio. Later, while still driving his truck on the interstate, he saw the Pontiac pass him at a high rate of speed. He saw three people in the car and was able to see three letters on the license plate: YNZ. Wich learned of the murder of Aly Thao two days later in a newspaper and contacted the police to tell them the events he had observed.

Another truck driver, David Nauman, was also driving north on Interstate 55 on the night of December 26. He saw a small light-blue car along the side of the road and saw two males jump in front of his truck to flag him down. They told him their brother had been shot and killed. Nauman, after an unsuccessful attempt to get help over his C.B. radio, took one of the males to a telephone to call the police.

William Cunningham was working at a gas station in Decatur on this night. At about 11:30 p.m., a car pulled into the station, and three black men got out. One pumped the gas and another paid Cunningham. While these two men were out of the car, the third man, the driver, drove off without them. Subsequently, Eldon Berg, a friend of Cunningham's, drove into the station. Berg took the two stranded men to the Decatur police station. A dispatcher there advised Berg to take the men to the Salvation Army where they could spend the night. Berg did so, but the two men told him they did not want to stay there and asked to go back to the police station. Once at the station, they were "kind of reluctant" to go inside, according to Berg, but eventually did so. Berg identified the two men in court and stated he knew them as Claude Kilbert and Derrick Jones. Kilbert and Jones were held at the police station and questioned about the murder and robbery.

Delbert Taylor, a Decatur police officer, was on patrol on the night these events occurred. He had heard a radio call to watch for a 1975 Pontiac Grand Prix with license number YNZ861. He saw a car matching this description with a black man driving it. Taylor identified defendant as being that man. Defendant pulled up to Taylor's unmarked car and asked for directions to St. Louis. After giving defendant directions, Taylor followed the car in order to view the license plate. Taylor saw the car stop near where another vehicle had become stuck in the snow. This is where defendant was arrested. Taylor looked into the Pontiac and saw a shotgun or rifle between the front seat and the console, a handgun on the front seat, and another handgun on the rear floorboard. He also saw cassette tapes in the car. Police also later found a tape player, a check stub, and a wallet in the car, among other items.

David Thao identified the tape player, the tapes and the wallet found in the Pontiac as belonging to him. Long Thao identified the check stub as belonging to him. In addition, a picture taken from defendant's coat after his arrest was identified by Long as the picture of his friend he had had in his pocket on the night his family was robbed.

Krail Lattig, a forensic scientist from the Illinois Bureau of Scientific Services, testified that the shotgun recovered from the car was loaded and could have been fired.

The State also presented statements made by defendant while in custody showing his involvement with the murder and robbery. Because defendant claims some of these statements should not have been admitted at trial, we include here the circumstances surrounding the making of these statements, elicited at a hearing on the defendant's motion to suppress them prior to trial.

At the hearing on the motion to suppress, the defendant indicated that he was arrested late on December 26, 1983, or early in the morning of December 27, that upon being arrested he was taken first to the Decatur police department, and that the first time he was approached by the police while in custody was on a date he could not recall at 12 or 1 a.m. He thought the name of the policeman involved was "Brown." Initially the officer advised him of his *Miranda* rights, at which time, he said, he asked to call his attorney. At about 6:30 or 7 a.m. that same day an officer approached him attempting to obtain a statement. The defendant testified that he had told the officer that his name was "Anthony Avery." He denied having been advised of his rights at this time and denied having told anything to Officer "Brown" or "Higgins." The defendant recalled having signed no

statement in the name of "Anthony Avery." He stated that he had arrived at the Montgomery County jail in the late afternoon of December 27 or 28. He thought that on December 27 two policeman approached him and greeted him as "Roosevelt Pollard." When confronted with that name, he said, he told them: "I had no rap for them. I told them that I had no talk." He said he was advised of his rights and remained silent. After that date, he said, he was approached again by police to make a statement. Of that time he stated, "I believe when I asked for an attorney at that time they came again." Asked, "At any time during the course of your first couple of days at the Montgomery County Jail, do you recal [sic] signing or stating that you gave up your right to remain silent and then proceeding to discuss anything?" he answered, "No."

At the hearing on the motion to suppress the State presented the following evidence. Robert Pittenger, a detective employed by the city of Decatur, testified that he had interviewed the defendant at about 1 a.m. on December 27, 1983. He read the *Miranda* rights to the defendant, who signed a waiver-of-rights form. The witness stated that the defendant did not request an attorney and did not refuse to speak with him. The defendant told the witness that he had left St. Louis on December 26, obtaining a ride from a truck driver who dropped him off at a weigh station that was closed. Two black males and a black female picked him up and gave him a ride to a store. There he obtained a ride from a man driving a light-colored Ford Torino who dropped him off near the place where he was arrested. The witness had told the defendant that another suspect had stated that the defendant had done the shooting during the robbery. The defendant denied having done so and denied knowing the other two suspects in custody. He altered his account of what had happened to state that the car was a dark-colored Trans Am. Later in the conversation the defendant admitted that he had gone to Decatur with the other two suspects in a Grand Prix. He told the witness that if he "wanted to know who done the shooting to go look at their hands and the one that done the shooting, their hands would be shaking." The defendant said then that he had nothing further to say and that he wanted to speak with his attorney, who was in St. Louis. The defendant did not, however, know the telephone number and did not make a call at that time. The witness thereupon terminated the questioning and returned the defendant to his cell at 3:41 a.m.

Dennis Higgins, an agent for the Illinois Department of Law Enforcement, Division of Criminal Investigation, testified that on December 27, 1983, he had gone with Agent Bowman of his department

to the Decatur police department and had interviewed the defendant at about 9:30 or 10 a.m. The witness advised the defendant of his *Miranda* rights. The defendant signed a waiver-of-rights form in the name of "Anthony Avery" and gave a written statement in the same name at 10:51 a.m. The defendant did not request an attorney. In the statement the defendant said that on December 26 he had been hitch-hiking from St. Louis to Chicago and had been given a ride in a Grand Prix occupied by three black males, a black female, and a baby. The driver of the Grand Prix bumped into a blue car on Interstate 55. The two persons in the front seat of the Grand Prix got out of the car, and the defendant heard two shots. The driver of the Grand Prix threw something on the floor in the back of the car and drove off. Later, out of an open window of the Grand Prix, the woman fired a gun. Eventually the defendant was able to leave two of the men at a gas station by jumping into the driver's seat and driving the car away while the two were outside the car. Thereafter the other man and the woman got into another Grand Prix, and the defendant proceeded along the highway until he stopped to help someone whose car was stuck in the snow, whereupon he was arrested.

The witness testified that he had talked to the defendant as Anthony Avery on December 28 as a result of having been informed that Anthony Avery and the other two suspects wanted to talk with him and Agent Bowman in order to tell the truth about the occur-rences of December 26. The witness stated that he "either received a telephone call or somebody from the sheriff's office" came to the Montgomery County State's Attorney's office, where the witness was at the time, with the information that the three wished to speak with him. He then notified Agent Bowman to meet him at the Decatur po-lice department. Later that day he and Agent Bowman met with each of the other two suspects and, thereafter, the defendant. They advised the defendant of his *Miranda* rights and stated that they had talked with the other two suspects about the occurrences on December 26, and asked him if he wanted to change in any way the account he had given in his statement to them on December 27. The defendant stated that he did not want to talk and that what he had to say he had al-ready said.

The witness stated that he had learned the defendant's identity and went with Agent Bowman on December 30 to "confront Mr. Avery with his true identity as far as being Roosevelt Pollard, Jr." Asked why he had used a different name, the defendant replied, "I was tired of using that name." The defendant then stated that he wanted to tell the truth concerning the evening of December 26. He

was advised of his rights by the witness and stated that the agents did not need to advise him of his rights because, the defendant said, he had been in the prison system before and knew his rights. He did not ask for an attorney and confessed to his involvement. He stated that he had been with the other two suspects, namely Kilbert and Jones, when they had approached the Thaos' vehicle. The defendant admitted that he had intended to rob the occupants of the car and said he had approached the vehicle holding a shotgun in order to commit armed robbery but that the shotgun was not in working condition. The defendant said that he had used that particular weapon, which had been his father's, so that he could not hurt anyone. He stated that the other two suspects also had guns, that during the robbery he had heard a shot, and that they had returned to the car and left the scene. Having said these things, the defendant asked for an attorney, at which time all questioning ceased. The witness testified that when he went to talk with the defendant on December 30 he did not intend to reinterview him or talk to him about the occurrences of December 26.

Tom Bowman, employed by the Illinois Department of Law Enforcement, Division of Criminal Investigation, testified similarly. He stated that on December 28 he had received a call from Agent Higgins with the information that the three suspects in Decatur wished to talk with them again. With regard to that interview, he testified as follows during direct examination:

"Q. [State's Attorney] Could you describe how you first approached [the defendant] and what was said and what he replied?

A. We asked him what he had to say. We were under the impression that he wanted to talk to us.

Q. What did he reply when you said, 'What do you want to say?'

A. He was advised of his rights prior to that. We told him if he has a statement he has to know his rights. Agent Higgins advised him of his rights at which time we started to talk to him. And he said, asked him why he wanted to talk to us and he indicated that he just wanted to tell us again what he had told us previously.

Q. Now, did he go step by step into detail or did he just say—

A. That's pretty much it. He said, 'I just wanted to tell you what I told you yesterday. I don't have anything to add.''

On cross-examination the witness was asked how he and Agent Hig-

gins had led into the interview of the defendant on December 28, to which he answered, "We led into it by asking what he wanted." The defendant had responded that he had nothing to add. The witness said that on December 30 the defendant, after indicating what his real name was, stated that he wanted to tell the truth. The statement that he wished to tell the truth was not, the witness said, in response to any question posed by either agent. The defendant indicated in his statement on December 30 that Claude Kilbert, one of the other suspects in custody, had shot the Thao boy.

Of the four occasions upon which the defendant made statements to the police, he contends that the only statement that is admissible into evidence is the first of the two statements he made on December 27, 1983, that is, the statement made to Detective Pittenger. He claims on the basis of *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, that all the other statements were erroneously admitted and should have been suppressed, having been taken in violation of his fifth amendment right to counsel. The court held in *Edwards* that an accused who has expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. In *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1044-45, 77 L. Ed. 2d 405, 411-12, 103 S. Ct. 2830, 2834, the court discussed the test laid down in *Edwards*:

> "We did not there hold that the 'initiation' of a conversation by a defendant such as respondent would amount to a waiver of a previously invoked right to counsel; we held that after the right to counsel had been asserted by an accused, further interrogation of the accused should not take place 'unless the accused himself initiates further communication, exchanges, or conversations with the police.' [*Edwards v. Arizona* (1981),] 451 U.S. at 485[, 68 L. Ed. 2d 378, 101 S. Ct. 1880]. This was in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was. We recently restated the requirement in *Wyrick v. Fields*, 459 U.S. 42, 46 (1982) (*per curiam*), to be that before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the 'suspect himself initiates dialogue with the authorities.'
>
> But even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through coun-

sel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation. This is made clear in the following footnote to our *Edwards* opinion:

'If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, *whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances*, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' 451 U.S., at 486, n.9[, 68 L. Ed. 2d 378, 387 n.9, 101 S. Ct. 1880, 1885 n.9] (emphasis added).

This rule was reaffirmed earlier this Term in *Wyrick v. Fields, supra.*"

██ The State concedes that the second statement made by the defendant on December 27 should not have been admitted at trial but contends that the error was harmless beyond a reasonable doubt. The statement was inconsistent with both earlier and later statements given by the defendant. However, the statement of the defendant given earlier on December 27, which he concedes was properly admitted into evidence, was itself riddled with inconsistencies. Furthermore, evidence against the defendant, quite apart from the defendant's statements to the police, was overwhelming. We, therefore, agree with the State that the admission of the defendant's second statement given on December 27 was beyond a reasonable doubt harmless error, without which the outcome of defendant's trial would have been no different. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

██ In the first interview of the defendant by police on December 27, when the defendant stated that he wished to speak with an attorney, all questioning ceased. The State showed, however, through the testimony of Agents Higgins and Bowman that the defendant initiated further communication with the police on December 28. Agent Bowman testified to the effect that when the defendant was asked why he had asked to talk to the police, the defendant had answered that he had wanted to reiterate his statement of the day before and wished to add nothing. There was no suggestion that the defendant

had responded, for example, that he had not asked to see the police. Agent Bowman's testimony was uncontradicted by that of other witnesses, including the defendant, and the testimony of Agent Bowman elicited on cross-examination supported that adduced on direct. Prior to speaking with the defendant on December 28, in response to his request to speak with the police, the agents had advised him of his constitutional rights. The waiver by defendant of his rights appears to have been knowing, intelligent, and voluntary under the totality of the circumstances, including the fact that the defendant, not the police, reopened the dialogue with the authorities. Thus, it was not error for the trial court to have refused to suppress the statement made by the defendant on that date and to have admitted it into evidence.

■ With regard to the statement of the defendant on December 30, we note first that it was made after the defendant had initiated further communication with the police on December 28. After initiating further communication with the police on December 28, the defendant did not indicate that he wished to speak with an attorney until after he had made the statement on December 30 sought to be suppressed. Even if the defendant had not already initiated further communication with the police on December 28, we think that he did so on December 30 by stating that he wanted to tell the truth concerning the occurrences of December 26. The police had approached the defendant on December 30 because of information they had obtained concerning his identity. They had not only the right but the duty to determine his true identity and were not inquiring about the occurrences of December 26. Nothing about either his real name or the alias he used linked him to the crimes in question, and the question by police concerning his reason for using a different name did not constitute "interrogation," that is, words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. (*Rhode Island v. Innis* (1980), 446 U.S. 291, 302, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689-90.) As in *United States v. Taylor* (4th Cir. 1986), 799 F.2d 126, in which the defendant was questioned concerning his identity following his unfulfilled request for counsel, the agents here had no reasonable expectation that their questions concerning his identity would be likely to elicit an incriminating response. In fact, the defendant's response concerning his reason for using another name was not incriminating. He did not make an incriminating statement until after he had once again initiated further conversation with the police by stating that he wanted to tell the truth concerning the occurrences of December 26. He was advised of his rights once again and stated that he already

knew them because of previous experience with the prison system. The defendant did not ask for an attorney and did not choose to remain silent but proceeded to make a statement implicating himself in the crimes committed on December 26. When he did ask for an attorney thereafter, the police immediately terminated the conversation. Once again, the waiver by defendant of his rights appears to have been knowing, intelligent, and voluntary under the totality of the circumstances, including the fact that the defendant, not the police, reopened the dialogue with the authorities. The trial court did not err in denying the defendant's motion to suppress the statement made on December 30 and properly admitted it into evidence.

With respect to the other issue the defendant raises, the trial court stated as follows at the sentencing hearing:

"The Court must make a finding as to factors in aggravation and mitigation. The Court really cannot find any factors in mitigation that the Court feels are applicable in this case. The Court finds as factors in aggravation that the defendant's conduct indeed caused or threatened serious harm, that the defendant has a history of criminal activity, that a sentence is necessary to deter others from committing the crime."

The court observed that the offense occurred on a public highway to a family traveling during the holidays. Upon sentencing the defendant the trial court stated further:

"[D]efendant is sentenced to 40 years given the fact that once a murder occurred, the defendant did not restrain [sic] further criminal activity. This defendant and others went about their business. Did not seem to upset them unduly. In fact, they went along about their business. It's being taken into consideration the fact the boy was only 12 years old and based upon the representation of his family as they testified, if he's like his brothers, he was going to be a credit to society and he was deprived of that for no reason whatsoever. Absolutely no excuse. No reason for his death. The Court has no problem at all imposing the maximum sentence of 40 years. That will be the order of the Court."

The defendant maintains that the trial court abused its discretion in sentencing the defendant by relying upon its finding that his conduct caused or threatened serious harm. He argues that "[b]ecause serious harm is implicit in all murders the trial court abused its discretion in considering it as a factor in aggravation" and requests that his sentence be vacated and the cause remanded to the trial court for another sentencing hearing.

 We are aware of the recent decision of the supreme court in *People v. Saldivar* (1986), 113 Ill. 2d 256, in which the court held that in sentencing a defendant on a conviction for voluntary manslaughter it is permissible for the trial court, in applying the statutory aggravating factor that the defendant's conduct caused serious harm to the victim, to consider the force employed and the physical manner in which the victim's death was brought about. However, we need here make no determination in this regard. The imposition of a sentence is a matter of judicial discretion in the absence of which the sentence of the trial court may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case. (68 Ill. 2d 149, 368 N.E.2d 882.) Reliance on an improper factor in aggravation does not always necessitate remandment for resentencing. (*People v. Bourke* (1983), 96 Ill. 2d 327, 449 N.E.2d 1338.) Where the reviewing court is unable to determine the weight given to an improperly considered factor the cause must be remanded for resentencing; however, where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required. (96 Ill. 2d 327, 449 N.E.2d 1338.) Here, as in *Bourke*, the record adequately demonstrates that the weight placed on the aggravating factor relating to serious harm was so insignificant that it did not result in a greater sentence. As we have already indicated, we make no determination whether the trial court's consideration of that factor was improper. By its remarks the trial court plainly imposed the sentence of 40 years upon the defendant's conviction for murder because of the age of the victim, the circumstances of his slaying, and the defendant's attitude following the killing of this 12-year-old child. As the State points out, had the murder victim been under 12 years of age at the time of the offense, the trial court might have imposed an extended term sentence (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(3)(i)) of not less than 40 years and not more than 80 years (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a)(1)). Under the circumstances the imposition of a sentence of 40 years of imprisonment for the offense of the murder of a 12-year-old child was within the limits within which discretion could be exercised and was not an abuse of the trial court's discretion. Hence, we do not disturb the sentence the trial court imposed.

Affirmed.

KASSERMAN, P.J., concurs.

JUSTICE HARRISON, dissenting.

I respectfully dissent.

The statements made by defendant to the police on December 30 are inadmissible under the rule of *Edwards v. Arizona* (1981), 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1885, which states that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." This is a bright-line rule. (*Smith v. Illinois* (1984), 469 U.S. 91, 98, 83 L. Ed. 2d 488, 495, 105 S. Ct. 490, 494.) Defendant here had invoked his right to counsel on December 27. Defendant did not initiate the December 30 conversation with the police. Thus, any statements made at that meeting were inadmissible. The majority concludes that defendant initiated further conversation with the police by "stating that he wanted to tell the truth concerning the occurrences of December 26." This conclusion ignores the fact the agents came to defendant's cell uninvited to question him about the use of an alias. Under *Edwards*, a valid waiver of the right to counsel cannot be established by showing only that a defendant responds to further police-initiated interrogation even if he has been advised of his rights. (*Edwards v. Arizona* (1981), 451 U.S. 477, 484, 68 L. Ed. 2d. 378, 386, 101 S. Ct. 1880, 1884-85.) Furthermore, the majority's reference to a footnote in *Edwards* is misplaced. That footnote states:

> "If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." 451 U.S. 477, 486 n.9, 68 L. Ed. 2d 378, 387 n.9, 101 S. Ct. 1880, 1885 n.9.

The situation in the present case is not the situation described in the footnote. Here, the officers initiated the conversation and did something which amounted to interrogation before defendant made the incriminating statements. Had defendant called the agents to his cell, made incriminating statements, then answered questions from the

agents, the rule set forth in the footnote would apply.

The majority states that the police "had not only the right but the duty to determine his true identity and were not inquiring about the occurrences of December 26." The majority has apparently determined that the agents' words and actions did not amount to interrogation. However, interrogation includes not only express questioning, but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689-90.) For example, in *People v. R.C.* (1985), 108 Ill. 2d 349, 483 N.E.2d 1241, the defendant had asserted his right to remain silent, then was told by police that an officer had identified him as the person who had fled from an earlier arrest attempt. Our supreme court, referring to the police telling defendant he had been identified, stated: "This was an obvious effort to persuade R.C. to make a statement." (108 Ill. 2d 349, 354, 483 N.E.2d 1241, 1244.) In *People v. Thompson* (1982), 107 Ill. App. 3d 285, 437 N.E.2d 916, the defendant had asserted his right to remain silent, but was subsequently asked by police if he wanted to see other suspects who were making incriminating statements about him. The defendant made an incriminating statement after a confrontation with the other suspects. The court found the police practices employed amounted to interrogation. (107 Ill. App. 3d 285, 288-89, 437 N.E.2d 916, 918-19.) Likewise in *People v. Savory* (1982), 105 Ill. App. 3d 1023, 435 N.E.2d 226, police confronted the defendant with discrepancies in his story. The court found this was the functional equivalent of express questioning. 105 Ill. App. 3d 1023, 1029-30, 435 N.E.2d 226, 231.

In the present case, the agents should have known that their words and actions were reasonably likely to elicit an incriminating response. This is not a case, contrary to the majority's belief, where police were engaged in routine ministerial questioning during an arrest (*United States v. Taylor* (4th Cir. 1986), 799 F.2d 126) or booking process. (*People v. Davis* (1981), 103 Ill. App. 3d 792, 796, 431 N.E.2d 1210, 1213.) The agents had learned defendant's real name through a fingerprint analysis. Therefore, they did not need to ask defendant his real name, for they already knew it. The officers testified they went to defendant's cell to "confront" him with his true identity, not to learn it. In effect, the agents went to defendant's cell to confront him with their knowledge that he had been lying. While "confronting" defendant with his true identity alone was reasonably likely to elicit

an incriminating response, it is irrefutable that the officers should have known that their further question to defendant of why he had been using a false name was reasonably likely to elicit an incriminating response. Already having knowledge of defendant's true identity, there could be no purpose for the agents' confrontation with defendant other than to elicit incriminating statements.

The majority also notes that the statements of December 30 were made after defendant had initiated further communications with the police on December 28. The conclusion that defendant initiated the December 28 conversation is not supported by the evidence. Agent Higgins testified that while he was in the State's Attorney's office on December 28, a person he could not identify informed him that the three suspects in the case wanted to speak to him. He and Agent Bowman went to defendant's cell, gathered biographical data from defendant and advised him of his rights. Defendant then simply said that he did not want to talk and that what he had to say he had said previously. I agree with defendant that the State failed to show he initiated this meeting. Under the Code of Criminal Procedure of 1963, once defendant moved to suppress evidence of his statements to police, the State had the burden of proving the voluntariness of the statements. (Ill. Rev. Stat. 1985, ch. 38, par. 114—11(d).) The applicable standard requires proof by a preponderance of the evidence. (*People v. King* (1986), 109 Ill. 2d 514, 525, 488 N.E.2d 949, 955.) There is no evidence of a request by defendant to see the agents. There was merely testimony by Higgins that he was told by some unidentified person that the three suspects wanted to see him. Furthermore, when the agents arrived at defendant's cell, defendant stated he did not want to talk to them. I cannot conclude the State met its burden of proving defendant wanted to waive his right to counsel which he had invoked earlier.

Nor can I conclude the error here was harmless.

"[I]n determining whether a constitutional error is harmless beyond a reasonable doubt, '[t]he focus should *** be upon the character and quality of the illegally obtained evidence as it relates to the other evidence bearing on the same issue and the court should appraise the possible impact upon the jury of the wrongfully obtained evidence.' (*People v. Black* (1972), 52 Ill. 2d 544, 555, [288 N.E.2d 376, 383,] *cert. denied* (1973), 411 U.S. 967, 36 L. Ed. 2d 689, 93 S. Ct. 2155.) *** [A] confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable." (*People v. R.C.* (1985), 108

Ill. 2d 349, 356, 483 N.E.2d 1241, 1245.)
Other than defendant's statements, the evidence of his guilt was entirely circumstantial. No witness identified defendant as being at the scene of the murder and armed robbery. While defendant made statements to the police on four occasions, only in the December 30 statements did defendant admit that he had helped carry out the armed robbery and had used a shotgun to do so. Thus, I cannot say admitting the statements of December 30 was harmless beyond a reasonable doubt.

For these reasons, I would reverse defendant's conviction and sentence and remand the cause for a new trial. Consequently, I will not discuss whether admission of defendant's statements during the second session on December 27 amounts to harmless error, but would require those statements be excluded at the new trial.