THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PAUL S. QUEEN, Defendant-Appellant.

Fifth District   No. 80—571

Opinion filed July 13, 1982.

Randy E. Blue and E. Joyce Randolph, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Martin N. Ashley and Frank J. Bieszczat, both of State's Attorneys Appellate Service Commission, of Mt. Vernon, for the People.

JUSTICE WELCH delivered the opinion of the court:

On January 4, 1979, Lida Belle King was found dead in her Du-Quoin, Illinois, apartment. The results of an autopsy indicated that she had been strangled. In March of that year, the defendant, Paul S. Queen, was charged by a Perry County indictment with the murder of Mrs. King. Following a bench trial in July of 1979, he was convicted of murder and sentenced to 30 years' imprisonment. He appeals to this court, and argues that the trial court abused its discretion in failing to order an examination into his fitness to stand trial, and that the State's evidence was insufficient to prove him guilty of murder beyond a reasonable doubt. We agree with the first of his contentions.

The defendant first appeared before Judge Robert Bastien on March 29, 1979, for purposes of his arraignment. As a preliminary matter, the court inquired about the defendant's educational background, to which he replied that he had gone to eighth grade, had some additional training in high school and then "took college and law school." When asked where he went to college, the defendant answered that he "took it in law school." Judge Bastien then asked him where he studied law, and the defendant responded, "Perry County and with the Army." The defendant also told Judge Bastien that he had a bachelor's degree and that, in fact, he had "two or three of them some place," but he didn't know where they were.

In order to determine the defendant's eligibility for the services of the public defender, the court asked if the defendant owned any real estate. The defendant said that he was "supposed to," but "the real estate company has changed around" on him. He further stated,

> "I don't know what they did since they started changing the highways and the electric around because I called and they were getting me into public housing and all."

During the course of the arraignment, the defendant informed the court that he "just came back from spending 2½ years in Quincy, but I had the Advocate General up there."

The defendant's next appearance before Judge Bastien came on May 15, 1979, when the defendant sought to waive his right to a jury trial. In this hearing, the State's Attorney suggested to Judge Bastien that, upon his investigation, it appeared that there was a *bona fide* doubt of the defendant's fitness to stand trial. The State's Attorney read the appropriate statutory provision (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1) to require that, once the issue of the defendant's fitness has been raised, the court must hold a preliminary hearing to determine whether there is a *bona fide* doubt of the defendant's fitness, and, if so, then a full fitness hearing would be needed. The court stated that once a *bona fide* doubt of the defendant's fitness is raised, the full fitness hearing must be held, without the necessity for any sort of preliminary hearing. Judge Bastien then terminated the jury waiver proceedings and ordered the State to file a motion raising the question of the defendant's fitness to stand trial.

On May 16, the State's Attorney orally requested the court to reconsider the order directing him to file a motion concerning the defendant's fitness. This motion was denied, and, on May 17, the State filed a petition to hold a fitness hearing. This was accompanied, on the following day, by a motion to withdraw that petition.

Attached to the State's petition were several written statements from law enforcement personnel which had given rise to the State's Attorney's doubts of the defendant's fitness to stand trial. DuQuoin Police Chief Walter Minton had gone to the defendant's residence to arrest him. According to Chief Minton, the defendant told him, "You can't arrest me." He further stated that "the court can't arrest me, the county can't arrest me and the State can't arrest me. The only guy that I take orders from and the only guy that can arrest me is General MacArthur." The defendant indicated to Minton that he was aware of what murder was, but that no one in this world could put him in jail.

The defendant professed to Minton to have once been a lawyer,

doctor, and the owner of a large construction company. He said that he "didn't think the world was all together" and warned that it "wasn't safe to keep driving." The defendant told Minton that he thought the world was flat and that "there was a red light up there to stop you and keep you from driving off."

In his report, Chief Jerry Minton opined that the defendant could not "keep on the same track" when he was questioned. He would answer him in "an unrelated way." Minton offered examples of the defendant's responses to his inquiries.

"QUESTION: Do you drink?

ANSWER: I didn't do anything.

QUESTION: Have you ever spent time in prison?

ANSWER: I was in Quincy and I was a lawyer.

QUESTION: Do you know what strangling is?

ANSWER: I was a doctor once too."

In his report, Sheriff Jerry Woolsey noted that he had observed and spoken to the defendant on several occasions in the Perry County Jail. He said that the defendant "repeatedly demonstrated inappropriate responses to questions asked of him." Woolsey commented that the defendant's behavior was "of concern" to himself and the staff members as well as fellow prisoners. His behavior included what Woolsey termed "bizarre and inappropriate responses to daily activity at the jail."

Woolsey further related in his report:

"On several occasions he has seemed disoriented as to time and place and has expressed great concern over the fact that he does not understand why he is being held in custody. He has repeatedly stated that he has no idea why he can't go home."

It was Woolsey's conclusion that the defendant was exhibiting the same type of behavior that he did when he was in the custody of the Illinois Department of Mental Health's Chester facility from 1966 to 1968. Woolsey was employed at that facility during that time.

The report of Sheriff Timothy Russell provided additional support for the observations of Woolsey and Minton. Russell also remarked on the defendant's tendencies to answer questions by "rambling about totally unrelated subjects." He stated that twice, during an interview on March 28, 1979, the defendant "flared up and began raging for no apparent reason." The following day, the defendant was to be taken to the Perry County Courthouse for arraignment. Russell related that

"Queen seemed to be calm at the time. I asked Queen to turn around and put his hands behind his back so I could handcuff him. Queen did exactly as I asked but before I could put the

handcuffs on, Queen turned and started raging. Queen doubled up his fists and shook them and was shouting. I started talking to Queen in a calm voice for several minutes asking Queen to calm down. After several minutes, Queen calmed down and then did exactly what I asked him to do."

Officer Carl Melton also prepared a report of the defendant's activities at the Perry County Jail. This report is handwritten and is not in final form as are the other three evaluations, and consequently is more difficult to interpret. However, it is obvious that the defendant kept telling Melton about "they," who were those people "in the towers" or "on radar."

On May 18, 1979, a hearing was held on the State's motion to withdraw its petition for a fitness hearing. The State's Attorney argued that he was vested with the discretion to withdraw the petition, in much the same way that he could decide whether or not to proceed with any particular prosecution. Judge Bastien then remarked that defense counsel would have had a better opportunity to gauge the defendant's capacity to cooperate in the presentation of his own defense than would either the court or the State's Attorney. To this observation defense counsel replied that he did not want to make a statement at that time.

The court continued,

"As I read the statute, the Code of Corrections, the court is not empowered to order expert examination of the defendant regarding his fitness to stand trial or to be sentenced. Is either side at this time requesting under the statute that a doctor or expert be appointed to make such an examination?"

Both counsel replied in the negative. The court then granted the State's motion to withdraw its petition, and directed that the defendant be brought into court, to complete the jury waiver proceedings. The court admonished the defendant:

"In case you do not have the complete information in your mind, I will explain to you one more time that you do have the right to a trial by jury on this murder charge. And Mr. Sims [defense counsel] have you discussed with Mr. Queen his right to a trial by jury?

MR. SIMS: Yes Sir.

THE COURT: Is that correct, Mr. Queen?

MR. QUEEN: If that is what they really want. I was willing to waive the other day.

THE COURT: As I said, those proceedings were ended through no fault of your own.

MR. QUEEN: I can understand part of it, but so far I have no definite proof or anything like that as to time or place which I know would be brought out in court. But right now I have no idea of."

The court accepted the defendant's waiver of a jury trial.

The defendant's case proceeded to a bench trial in July 1979 before Judge William Starnes. The State introduced testimony which showed that the defendant had been seen speaking with Mrs. King several days before she was found dead in her apartment. Polygraph examiner Dennis Smith testified that, after he conducted a polygraph examination of the defendant on January 11, 1979, he asked the defendant about the death of Mrs. King. At first, he claimed not to remember the incident, then later he told Smith that he did not kill Mrs. King.

Much of the State's case was based upon scientific testimony presented by pathologist Steven Nuernberger and forensic odontologist Roger Adams. Dr. Nuernberger, who performed an autopsy on the body of Mrs. King, recalled that, during the autopsy, he discovered what appeared to be a bite mark on her right arm. Due to the reaction of the surrounding tissue to the trauma caused by the bite, Dr. Nuernberger was able to conclude that the bite must have been inflicted between two hours prior to Mrs. King's death and one hour after her death.

A skin sample containing the bite mark was removed from Mrs. King's body by Dr. Nuernberger and was delivered to Dr. Adams in St. Louis, along with stone cast molds which had been made of the defendant's dentures. Dr. Adams made a comparison of the bite mark and the molds and concluded that it was quite likely that the mark had been made by the defendant's dentures. In formulating his opinion, Dr. Adams noted that the indentation left by a lateral incisor on Mrs. King's arm corresponded to a protruding incisor in the dentures. Dr. Adams stated that the uniqueness of this protrusion, combined with the lack of any feature in the dentures which would exclude them, assisted him in arriving at his conclusions.

At trial, the defendant did not testify, nor did he produce any witness in his own defense. At the conclusion of the trial, Judge Starnes found the defendant guilty of murder. A hearing was held on defendant's post-trial motion on February 1, 1980, at which time Judge Starnes ordered sentencing to be continued until the defendant had been examined to ascertain his fitness to be sentenced. Reports were submitted to the court, and, on April 24, 1980, the defendant was adjudged unfit to be sentenced. On October 30, 1980, Judge Starnes

found the defendant fit to be sentenced, and, after hearing argument on sentencing alternatives, sentenced the defendant to 30 years' imprisonment.

■ As section 5—2—1(c) of the Unified Code of Corrections provided during the pretrial proceedings and during trial, "[w]hen a *bona fide* doubt of the defendant's fitness to stand trial or be sentenced is raised, the court shall order that a determination of that question be made before further proceedings." (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(c).) In other words, once facts are brought to the attention of the trial court, either from observation of the defendant or by suggestion of counsel which raise a *bona fide* doubt of defendant's fitness to stand trial, the court has a duty to hold a fitness hearing. *People v. Murphy* (1978), 72 Ill. 2d 421, 430, 381 N.E.2d 677, 682.

In order to be considered fit to stand trial, a defendant must be able to understand the nature and purpose of the proceedings against him and to assist in his own defense. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(a).) This issue "is often a difficult one in which a wide range of manifestations and subtle nuances are implicated" (*Drope v. Missouri* (1975), 420 U.S. 162, 180, 43 L. Ed. 2d 103, 118, 95 S. Ct. 896, 908), and thus whether there is a *bona fide* doubt of a defendant's fitness for trial depends upon the facts of that particular case. (*People v. Murphy* (1978), 72 Ill. 2d 421, 435, 381 N.E.2d 677, 684.) The trial court's decision on this question will not be reversed absent an abuse of discretion. *People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630.

The People argue that the trial court acted properly in not holding a fitness hearing. Although recognizing the contents of the reports attached to the petition for a fitness hearing, the People stress that the defendant seemed to know the difference between a bench trial and a jury trial when he relinquished his right to the latter and he also indicated to the court that the main issue at trial would be his whereabouts when Mrs. King was killed. They contend that neither the police reports nor the fact that the defendant had been hospitalized over 10 years earlier cast doubts on the defendant's fitness to stand trial (*People v. White* (1977), 51 Ill. App. 3d 155, 366 N.E.2d 491; *People v. Richardson* (1978), 61 Ill. App. 3d 718, 377 N.E.2d 1235), and they further urge that the post-trial psychiatric evaluations, which, of course, were not then before the court, contain nothing to alter that conclusion.

While the People may be correct that the defendant was fit to stand trial, that is not the precise issue before this court. Whether or not the defendant would have been found fit, we must determine

whether the trial court erred in concluding, by not holding a hearing, that there was no *bona fide* doubt of the defendant's fitness. Under this standard, we believe that the trial court abused its discretion in not inquiring into the defendant's fitness to stand trial.

■■ At the time of the pretrial hearings, the court was presented with several reports which detailed the defendant's conduct. These observations came not from experts retained by the defense, nor from the defendant or his attorney, but from local law enforcement personnel entrusted with the care of the defendant. Each of these observers noted the defendant's inability to provide a responsive answer to questioning, and this trait also manifested itself at pretrial hearings. Wild and unsubstantiated claims made by the defendant as to his past employment and other matters, combined with Sheriff Woolsey's opinion that the defendant seemed "disoriented" and did not know why he was in jail convince us that a *bona fide* doubt of the defendant's fitness to stand trial was raised. The contents of the police reports and the defendant's demeanor at the pretrial hearings should have caused the trial court to direct that a fitness hearing be held. The court thus abused its discretion in failing to do so.

Because the trial of the defendant without a hearing on the issue of his fitness to stand trial resulted in the denial of a fair trial (*Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836), we must reverse the defendant's conviction and remand this cause to the circuit court of Perry County for a fitness hearing and whatever further proceedings may be appropriate.

Reversed and remanded.

JONES and KASSERMAN, JJ., concur.