THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL QUEEN, Defendant-Appellant.

Fifth District   No. 83—210

Opinion filed January 11, 1985.—Rehearing denied February 14, 1985.

Randy E. Blue and E. Joyce Randolph, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Service Commission, of Mt. Vernon, for the People.

JUSTICE HARRISON delivered the opinion of the court:

Following a bench trial in the circuit court of Perry County, Paul Queen, defendant, was convicted of murder. Defendant appealed to this court, and we reversed his conviction and remanded for a new trial, finding that the trial court abused its discretion in failing to order an examination into defendant's fitness to stand trial. (*People v. Queen* (1982), 108 Ill. App. 3d 1088, 440 N.E.2d 126.) Defendant was subsequently found fit to stand trial, the case was tried by a jury, and defendant was again found guilty of murder. Defendant appeals this conviction, arguing, among other things, that he was not proved guilty beyond a reasonable doubt.

The evidence offered by the State established that Lida Belle King, age 65, was strangled in her DuQuoin apartment on or about January 2, 1979. None of the witnesses who testified at trial had ever seen defendant enter or leave the victim's apartment, and no fingerprints suitable for comparison were found there. While witnesses testified that defendant and the victim sometimes talked to each other at Emling's Cafe, where both ate most of their meals, it was also established that it was not unusual for patrons of Emling's to converse, and that defendant and the victim had not been seen leaving the restaurant together at any time. The testimony most critical to the State's case was offered by Daniel Tollerud, who shared a prison cell with defendant for about one month, and by medical witnesses Dr. Steven Nuernberger and Dr. Roger Adams. Tollerud, who had been convicted of aggravated battery and burglary, testified as to a statement made by defendant to him during their mutual confinement:

"Q. Would you tell the ladies and gentlemen of the jury what [defendant] said about the murder for which he was in prison?

A. He told me that on that night he was sitting in a bar, a woman came in and sat down and they had a few drinks together, got up and left together and went to her apartment or house and she went in the other room and he went in the living room. After a while he passed out or blacked out and when he woke up he seen it was still dark outside, he got up and walked home."

Dr. Nuernberger, who performed the autopsy on the victim, testified that he found four bite marks on the victim's body. Dr. Nuernberger removed one of these bite marks by excising the skin containing

it; asked why he did not remove the others, he attributed his failure to do so to "stupidity" on his part. Dr. Adams, a dentist trained in forensic dentistry and oral surgery, testified that he compared molds made of defendant's dentures with the bite mark on the skin sample excised by Dr. Nuernberger. After testifying at length regarding his methodology, Dr. Adams offered the following conclusion:

"Q. And based on what you have testified here today relating to your examination, doctor, your examination of the casts [sic] models, the skin specimen, the photographs, did you form an opinion within a reasonable degree of medical, dental certainty?

A. Yes, I did.

Q. Would you tell the ladies and gentlemen of [the] jury what that opinion is?

A. Yes. When I examined this material I came to the conclusion that I could not exclude these dentures as being the mechanism for perpetrating these bite marks.

* * *

Q. Why is it? What is it about those dentures that made you come to that conclusion?

A. Well, I feel, when I initially started evaluating this case I went into it with a certain amount of reservance [sic] one dealing with some dentures. And I had some questions in my mind whether dentures could perpetrate a mark like this. So, I really strived throughout the entire investigation to exclude these dentures. I felt this was the best approach to take in this particular type of case. If I could find any portion of evidence that would exclude these dentures then I felt as though I would have done my job. When I finally concluded the valuation [sic] of the evidence I found nothing that I could definitely exclude these dentures on."

Under re-cross-examination by defense counsel, Dr. Adams further explained the meaning of his conclusion:

"Q. Doctor, the summation of your testimony is that these dentures could have made the bite marks. Is that right?

A. My statement was that I could not exclude these dentures from making the mark.

Q. All right. Does that mean the same thing to you as they could have made the bite mark.

A. That means the same."

Dennis Smith, an agent with the Illinois Department of Law Enforcement, testified regarding three conversations he had with defendant. In the first two conversations, defendant denied killing the victim

or knowing who had killed her; in the third conversation, defendant stated that he did not remember killing the victim, and then said he remembered that he did not. Agent Dennis Bowman, who also interviewed defendant, testified that defendant appeared nervous and seemed to be "selective" about what questions he responded to.

Testimony from defense witnesses established that defendant was a chain smoker, and that none of the cigarette butts found in the victim's apartment were of the brand which defendant smoked. Defendant's mother indicated that defendant stayed with her for several days in early January of 1979, because the room rented by defendant was too cold. Defendant's sister indicated that she saw defendant at their mother's residence at about 5:30 p.m. on January 2, 1979, and at about 4:30 p.m. on the next day.

Where a verdict of guilty is returned by a jury, it is our duty not only to carefully consider the evidence, but to reverse the conviction " 'if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged.' " (*People v. Bartall* (1983), 98 Ill. 2d 294, 306, 456 N.E.2d 59, quoting *People v. Jordan* (1954), 4 Ill. 2d 155, 156, 122 N.E.2d 209.) Upon careful examination of the record here, we are compelled to conclude that the State failed to prove the defendant guilty beyond a reasonable doubt. Defendant was never seen entering, leaving or in the victim's apartment, no identifiable fingerprints were found there, and the cigarettes found in the apartment were not of the type smoked by defendant. The forensic dentist who analyzed defendant's dentures and the bite mark on the victim's skin did not say that in his opinion defendant's dentures caused the mark; rather, he could do no more than conclude that they could have done so, and that he could not exclude that possibility. The testimony of Daniel Tollerud regarding defendant's statement to him, even if true, does not establish that defendant went to the apartment of the victim. Moreover, testimony establishing that defendant and the victim sometimes conversed in Emling's Cafe, and that defendant seemed nervous and "selective" when answering questions asked him by the police, does little or nothing to bolster the conclusion that defendant committed the crime. The evidence simply does not establish defendant's guilt beyond a reasonable doubt. We therefore reverse the judgment.

Reversed.

KASSERMAN and KARNS, JJ., concur.