THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RODNEY WOIDTKE, Defendant-Appellant.

Fifth District   No. 5—89—0668

Opinion filed January 31, 1992.

Daniel M. Kirwan and E. Joyce Randolph, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

Rodney Woidtke was found guilty of the murder of Audrey Cardenas on August 24, 1989, following a bench trial. On September 28, 1989, Woidtke was sentenced to 45 years' imprisonment.

The issues on appeal, in the order in which we will address them, are as follows: (1) whether the police had probable cause to arrest the defendant for the offense of obstructing a police officer; (2) whether the defendant's waiver of his *Miranda* rights was knowingly and intelligently made; (3) whether the trial court erred in the admission of Officer Newton's and Linda Armstrong's testimony; (4) whether the defendant was proven guilty beyond a reasonable doubt; and (5) whether the defendant is entitled to a new sentencing hearing where the defendant alleges the trial court considered an improper aggravating factor in sentencing. We affirm.

Audrey Cardenas, a *Belleville News-Democrat* intern reporter, who had been living in the area for about a week, did not report for work on June 21, 1988. When last seen it appeared that she was planning to go jogging on a local high school track. Fliers with a picture

of Miss Cardenas and a general description of her had been posted in public places and published in the local newspapers.

The body of Audrey Cardenas was discovered in a dry creek bed adjacent to the Belleville East High School on June 26, 1988, by a high school maintenance man. The victim was found lying on her back with her legs slightly apart and her arms out at her sides, partially raised toward her head. She was naked except for tennis shoes and socks, and an elastic ankle brace on her left ankle. A white blouse was on her left arm and a pair of pink shorts were near her right foot. A section of metal pipe was lying near her left side. A set of keys was found under her left hand after the body was moved. The body itself was infested with insects and maggots and badly decomposed. Crime-scene technician D.W. Heil testified at trial that he had observed signs of a struggle about 20 feet from where the body was found. Heil interpreted this to be consistent with someone being dragged on one knee and trailing a hand. Heil, however, was not certain of this and agreed that numerous police personnel had been in the area possibly distorting or destroying any marks in the mud of the creek bed.

Pathologist Raj Nanduri conducted the autopsy on the body, but she was unable to determine the precise medical cause of death due to the advanced degree of decomposition. She was able to rule out heart disease and gunshot or stab wounds to a vital organ. She also ruled out a severe blow to the head as cause of death due to the absence of any indication of injury to the *dura mater* lining the brain cavity. Dr. Nanduri could not rule out strangulation because the hyoid bone, which would usually be broken when a person is strangled, was missing. She could only determine, considering where and how the body was found, that the manner of death was homicide. She could not determine whether a sexual assault had occurred. Nanduri testified that death had occurred anywhere from 4 to 10 days prior to discovery. She did not observe any tattoos on the skin which remained on the body, but she did notice that certain teeth were missing. However, Dr. Nanduri believed they fell out due to decomposition rather than from a blow to the mouth. The items she removed from the body included a plastic red barrette, a pair of socks, a pair of tennis shoes, and a wristwatch, still running in the stopwatch mode.

Prior to trial, hearings were held on defendant's motions to suppress (1) all evidence obtained as a result of defendant's arrest and (2) any statements obtained during interrogation because of defendant's alleged inability to waive his *Miranda* rights.

### ARREST

Detectives Knefelcamp and Boyne testified at the hearing on defendant's motion to suppress evidence obtained as a result of the arrest. On the afternoon of June 26, 1988, the crime-scene area had been taped off approximately 200 yards beyond where the body was found. Sergeant Steve Knefelcamp was assisting the major case squad in its investigation of the crime scene when he noticed the defendant walking toward the creek bed where Cardenas' body had been found. The defendant, according to Knefelcamp, had walked about 150 yards past the yellow police line sticker and was about 50 yards from the creek bed.

When Detective Boyne initially approached the defendant and identified himself as a police officer, the defendant continued walking towards the crime scene and did not respond to Detective Boyne. Eventually Officer Boyne stopped the defendant and asked him who he was and if he had some identification. The defendant gave his name but said that he had no identification. Boyne was then joined by Knefelcamp and Detective Barfield. They asked the defendant where he was staying, and he replied he was staying with the Salvation Army. The officers sought to verify this but were informed by the dispatcher that, according to the Salvation Army personnel, the defendant was not staying there and never had. When confronted with this information the defendant said that he was staying in the wooded area and pointed in the direction of where the body had been found. Defendant then immediately pointed in another direction, saying, "Well, not there, over there."

Sergeant Knefelcamp testified that he asked the defendant if he had any identification on him or in his bag or backpack. When the defendant said no, Knefelcamp asked if he would mind if the officer took a look. The defendant said that he had no objection. Inside the bag and backpack were found clothing, books and notes, some of which contained sexual references. There were also letters apparently written by defendant to himself and relating to personal fantasies. When asked if he was married, the defendant said that he presumed himself married because he figured there was a woman out there somewhere that would marry him and love him.

At this point Sergeant Knefelcamp decided to question defendant further at a later time. He told Officers Boyne and Barfield to arrest the defendant for obstructing a police officer. The defendant was taken to the Belleville police department.

## INTERROGATION

At the hearing to suppress defendant's statements due to defendant's alleged inability to waive his *Miranda* rights, the State called Officers Boone, Wagner, Heffernan and Morgan. The defendant called Dr. Daniel Cuneo. Following his arrest, the defendant was interviewed and made several statements. Detective Walter Boone was asked to assist in the interrogation of Rodney Woidtke on the Cardenas murder on June 26, 1988. He and Detective Richard Wagner began to interview the defendant around 7:30 p.m. at the Belleville police department. The defendant was first asked if he had any mental or physical problems that would keep him from understanding what he was saying or doing or what the officers were saying or doing. The defendant replied no. The defendant was then read his *Miranda* rights, acknowledged that he understood those rights, and agreed to waive them.

Officer Boone then questioned the defendant about his sexual activities including acts of homosexuality. The defendant became upset and refused to talk with Detective Boone. At this point Boone left the room. He testified that he found the defendant's answers rational, and that defendant appeared to be upset but did not appear to be delusional, disoriented or confused.

Detective Wagner testified that after Officer Boone had left the room, he asked the defendant about his background. The defendant was able to clearly relate his background, and his answers to questions concerning the victim's death seemed responsive and appropriate. During the interview the defendant began to cry and stated that, if he had to die, he did not want it to be violent. Wagner viewed this as an acknowledgement that the defendant had done something wrong, was sorry for it, and feared he might get the death penalty. Detective Wagner found the defendant's answers responsive and appropriate. He testified that the defendant seemed sane during the questioning and apparently was not suffering from delusions or hallucinations. At one point the defendant did indicate that on occasions he heard voices, but he did not say he was hearing voices during the interview. The defendant stated that he had problems meeting and relating to women. Wagner said that at this time he told the defendant not to confess to anything he had not done. Eventually the defendant revealed that he had been in a mental hospital and that he was attempting to obtain follow-up treatment. When questioned as to why he would continue the interview knowing the defendant's mental history, Detective Wagner stated that as long as he was getting rational

answers to the questions he was asking, he would continue the interview.

At approximately 3 p.m. the following day, June 27, Detective Mark Heffernan interviewed the defendant. Before beginning questioning he advised the defendant of his rights. Defendant indicated that he understood those rights, but he refused to sign a statement to that effect. The interview lasted approximately 2½ hours. Heffernan said at the hearing that he found the defendant to be very calm and very rational but it was obvious to him the defendant had mental problems. The defendant related to Heffernan that he had had problems with women because they called him a homosexual and made fun of his small penis. It appeared to the officer that the defendant was intelligent and articulate, though his appearance was that of a transient. At one point in the interview the defendant admitted that he had killed Cardenas, but he denied that he had raped her. When Heffernan asked the defendant the location of the clothes he had worn during the attack, the defendant stated that "a guy that had anything on the ball at all would have gotten rid of those clothes." When the officer asked what had happened to the victim's panties, the defendant responded, "You've got a dump in this town, don't you?" When pressed for more details the defendant replied, "I've given you enough."

Twice during this interview the defendant asked if he could speak with a female detective, so Heffernan made arrangements to have Agent Debra Morgan interview the defendant. Morgan testified at the hearing that she began interviewing the defendant about 12:45 p.m. on June 28, 1988. Again the defendant was read his *Miranda* rights and said that he understood them. He signed a form to that effect, but his signature was illegible. According to Morgan, the defendant appeared to understand what was going on and responded appropriately to questions. The defendant gave no sign of hallucinations or delusions, and Morgan testified that she believed the defendant was sane at the time of the interview. A tape recorder was in the room, but Morgan agreed not to turn it on until the defendant agreed to have his statement recorded. At some point the defendant told Officer Morgan that he had been a patient at Alton Mental Health Center, and he told her about his problems with women. He told her that he had a habit of placing his hands in his lap, and he was afraid that the male detectives would feel that he was a homosexual.

The defendant told Morgan that he had lied when he spoke to the other detectives about what had happened to Cardenas and proceeded to tell her what had "really happened." Morgan testified that the

defendant seemed articulate and rational. Eventually the defendant agreed that Morgan could turn on the tape recorder. Sometime afterward, Agent Morgan stepped outside the interview room for approximately 30 to 40 seconds. When she reviewed the recording later she discovered that a portion of the interview that should have been recorded was missing.

Dr. Daniel Cuneo, a clinical psychologist, also testified at the hearing. Dr. Cuneo interviewed the defendant on July 7, 12, and 25, and August 1, 1988, at the St. Clair County jail, and on May 8, 1989, at the Chester Mental Health Center. Cuneo had also reviewed the major case squad's records of their interviews with the defendant and the defendant's records from Alton Mental Health Center.

The first exam by Dr. Cuneo was July 7, 1988, 10 days after the defendant's arrest. Dr. Cuneo testified at the hearing that the defendant was floridly psychotic and actively delusional. His thinking was loose and grandiose in that defendant thought by playing word games he would have power over other people. The defendant told Cuneo that when the police asked him if he "knew" Cardenas, he thought they meant "know" in the "Biblical sense." Defendant told the doctor that he thought that if he told the officers that he did not have sex with her they would think he was a homosexual. This obsessive fear of being labeled a homosexual continued throughout all of Dr. Cuneo's interviews with defendant.

Cuneo's opinion as to the condition of the defendant was that he was "insane" at the time of the obstruction charge. He testified that the defendant was "grossly psychotic" and in his opinion was probably delusional at the time he gave his statements.

While Cuneo found the defendant's mental problems apparent, he did state that a lay person might not be aware of defendant's mental problems merely by looking at him. On cross-examination, the doctor testified that Woidtke had a 91 I.Q., an average level of intelligence. He also stated that the defendant was capable of "understanding" his *Miranda* rights on June 26, 27 and 28, 1988, that defendant was capable of a "voluntary" waiver of those rights, and that the 11 days of incarceration prior to the first exam by Dr. Cuneo may have increased the defendant's paranoia.

As to his original opinion on the defendant's unfitness to stand trial, Dr. Cuneo said that that was due to defendant's gross paranoia. In other words, while he could not cooperate fully with his attorney, he did understand court proceedings. When questioned by the court, Dr. Cuneo stated that, while the defendant was delusional, he could

"knowingly, intelligently waive a statement. He understands those rights."

The court denied the defendant's motion to suppress statements because of his alleged inability to waive his *Miranda* rights, on July 13, 1989. On August 21, 1989, the court denied defendant's motion to suppress all evidence obtained as a result of the defendant's arrest.

The defendant subsequently waived a jury trial and the matter proceeded to a bench trial before the Honorable Richard A. Aguirre, who had also heard the pretrial motions. In addition to the testimony of D.W. Heil and Dr. Nanduri, Detectives Boone, Wagner, Heffernan, Boyne, Knefelcamp and Morgan testified and elaborated on their pretrial testimony. Dr. Cuneo also appeared and testified.

### TRIAL

At trial Detective Wagner testified that he had asked the defendant if he would ever rape a woman. The defendant said that he might "if she would not give it up voluntarily." The defendant also said to Wagner, "If I have to die, I want to die gently and painlessly. If I live others will die. I don't want to be a homo. I don't want to be a woman and I don't want to be tortured unnecessarily by less than human beings." Wagner then testified that the defendant had told him that he had gone to the Deutsch Fest to see if he could meet a girl who would agree to have sex with him. The first girl he met, according to the defendant, was a blonde who refused to have anything to do with him. He then saw a white female, five-foot-two, 115 pounds, with shoulder-length brown hair, brown eyes, and a "nice build." She was wearing a halter top, bare shoulders, blue denim-type short shorts, and skimpy shoes, maybe heels. He followed the woman, after she left, to a park-like area. The defendant drew a diagram showing the location near the high school where he confronted the victim. He caught up with her at one point, grabbed her arm, and asked to talk to her. She agreed and they crossed the street towards the high school. The defendant said that he wanted to have sex with her, but she refused. She then struggled with the defendant, slapping him and scratching his arms with her fingernails. Defendant then told Wagner that he pulled off the woman's top, stared at her, then pulled her pants off. She got up, ran along the creek area, and then picked up a rusty object similar to a pipe. Defendant told Wagner that he grabbed the pipe from her and hit her with it on the back of the head. The woman fell to the ground, and defendant then took the victim into a wooded area and tried to have sex with her but was unable to complete the act. He covered her mouth because she was yelling and

screaming. He then claimed to have pulled the victim's pants back on her and left her. Defendant told Wagner that he thought she was alive when he left.

Heffernan testified that defendant had told him that he had killed Cardenas, but that he had not raped her. The defendant told the officer that he took the victim down into the creek to molest her but not to rape her. While down there she started cursing him and making "other noises." Defendant stated that he struck her three times in the jaw with his fist and put his hand over her mouth. The defendant then removed her clothing and inserted his finger into her vagina. Defendant went on to say that he had to do it in a hurry because he was "real hungry." When asked what he meant by this defendant just smiled. Defendant told Heffernan that the woman was wearing very provocative shorts and that the color of her clothing was white, pink and blue. When asked which items were which colors, the defendant responded, "I've given you enough."

The defendant also stated that although he had told the other detectives that he had struck the victim with the pipe, he had not. The pipe was just down there. When asked why he had gone back to the high school on June 26, 1988, defendant said that he was concerned because he had seen in the newspapers that the girl was still missing. He thought she might have been embarrassed by what had happened and run away. He had planned to notify the police if her body was still in the creek bed. Officer Heffernan commented that that had been a "Christian" thing to do. Defendant corrected him saying, "It's not Christian, it's humanitarian."

When questioned as to any sexual dysfunction, the defendant stated that he had erections all the time, including part of the time he was with the victim. The defendant stated the victim was "pretty strong for a little gal," but she was no match for him. He said that he had received some scratches on his arms and body during the struggle. Detective Heffernan testified that he saw older scratch marks on the defendant's arms and hands at the time of the interview.

The day following this interview Heffernan returned with the defendant to the crime scene. The defendant showed the officers how he had walked the victim down into the creek, and defendant then asked about the victim's relatives. The defendant asked Detective Heffernan to tell the victim's mother that he was sorry that her daughter was dead. The defendant said he was disoriented because when he was down there with her it had been dark. The defendant then turned around and walked up from the creek bed; according to Heffernan, defendant was grinning as they left the scene.

Agent Debra Morgan testified at trial as to her interview with the defendant. Morgan stated that two-thirds of the interview was spent discussing background. A tape recorder was placed in the room. At some point the defendant agreed to have the interview taped, and the recorder was turned on. Again the defendant talked about the difficulties he had experienced concerning women. He told Officer Morgan that in his interviews with the other detectives he had stated that he had killed the victim accidentally because he thought that if he made it look like an accident he would not have to spend the rest of his life in prison. The defendant divulged to Morgan that what actually happened was as follows.

He had met Audrey Cardenas at the athletic field near Belleville East High School. He walked up to her, had a short conversation, and said something in reference to her breasts. The defendant walked with her to the creek bed where he made a pass at her which she seemed to like. When he grabbed her crotch she started fighting with him. He tried to engage in sexual intercourse with her, but she ran from him and picked up a pipe that was in the creek bed. Defendant took the pipe from her and hit her in the head three or four times, and he punched her in the jaw. The defendant attempted to have sexual intercourse with the victim, but he said that his penis was very small and kept slipping out of her vagina. Instead the defendant had oral sex with her.

According to the defendant, Cardenas was carrying keys and a small gray pouch. Her hair was pulled back with a barrette and she wore a pink, blue, and white shirt, purple shorts, bikini underpants and high-heeled shoes. The defendant said the victim had a rose tattoo on her inner thigh and a bird tattoo on her shoulder.

When Agent Morgan later reviewed the tape of the interview, she found that part of the tape had been erased and instead contained a statement by the defendant not said while Morgan was in the room, specifically, "This is a bunch of fucking bullshit. Gee, can I stick my little dick in your ***."

O'Fallon Patrolman Brett Newton also testified at trial. He described how he had first encountered the defendant on May 13, 1988, when answering a complaint about a "possible mental subject" at a day care center. The officer found the defendant across the street from the day care center at a laundromat pay phone. After the defendant concluded his call, Newton gave him a ride to Fairview Heights. The officer said he again saw the defendant on May 16, 1988, following a 17- to 18-year-old white female, step for step, for a distance of approximately 150 yards, through a park. The officer

spoke with defendant, who gathered his belongings, and Newton then drove the defendant to Belleville.

Linda Armstrong, director of the day care center in O'Fallon, testified at trial. Armstrong stated that she saw defendant on May 13, 1988, watching the center's children on the playground. When she approached the defendant, he turned and walked away. She asked the defendant if she could help him. At that point the defendant looked at her and then started to walk away again. Armstrong asked him if he was lost and if he would like to come inside for coffee. She was trying to get him away from the children. At that point he followed her into the building where he drank from a drinking fountain. Armstrong, meanwhile, had instructed her bookkeeper to notify the police. Shortly thereafter the defendant walked out the door. Armstrong followed and again asked if she could help. The defendant, according to Armstrong, seemed dazed and said that he had lost his girlfriend. Defendant then reached over and kissed Armstrong on the cheek. She told him not to do that again, and he said he was sorry and asked her if she was married or had a boyfriend. The defendant eventually left and walked toward the laundromat across the street. Armstrong again saw the defendant about two days later as he walked along the highway about a mile from her house. She was driving home from work and saw him walking a few steps in one direction, turning around and walking in the opposite direction, and then repeating those activities.

Dr. Cuneo appeared at trial as a witness for the defense. The bulk of his testimony reaffirmed his pretrial testimony. Based on his own personal evaluations and the records of the major case squad, he diagnosed defendant as a paranoid schizophrenic. He stated the defendant was still obsessed with fears of homosexuality and was experiencing auditory hallucinations. The doctor described how the defendant was afraid to eat for fear people would think he was a homosexual and fellating someone. The defendant told Cuneo that he had heard voices telling him he was Jesus Christ or a devil worshiper. Defendant was reluctant to discuss this saying he was "kind of bowing to idols."

Dr. Cuneo described the defendant as extremely preoccupied with sex, with his own inadequacies, and with his fears of becoming a homosexual. The idea of being perceived as a homosexual was, according to the witness, Rodney Woidtke's greatest fear. The defendant, said Cuneo, would do anything to prove that he was not a homosexual.

With the factual background in mind, we first consider the issue of the validity of the arrest. The defendant alleges that the arrest

must be quashed and all evidence derived from it suppressed as the defendant was arrested on a mere pretext charge of obstructing a police officer in order to interrogate him about the Cardenas murder. An arrest may not be used as a mere pretext to avoid the requirements of the fourth amendment. (*People v. Hattery* (1989), 183 Ill. App. 3d 785, 813, 539 N.E.2d 368, 387.) However, an objectively reasonable stop or other seizure is not invalid solely because the officer acted out of an improper or dual motivation. *People v. Guerrieri* (1990), 194 Ill. App. 3d 497, 502, 551 N.E.2d 767, 770.

The fourth amendment of the United States Constitution requires an arrest to be supported by probable cause. (*People v. Murray* (1990), 137 Ill. 2d 382, 387, 560 N.E.2d 309, 311; *Henry v. United States* (1959), 361 U.S 98, 4 L. Ed. 2d 134, 80 S. Ct. 168.) Probable cause justifying an arrest without a warrant exists if the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed. (*Henry*, 361 U.S. at 102, 4 L. Ed. 2d at 138, 80 S. Ct. at 171.) The proper approach in evaluating compliance with the fourth amendment is to objectively assess the officer's actions in light of the facts and circumstances before him at the time without regard to his underlying intent or motivation. *People v. Hoskins* (1984), 101 Ill. 2d 209, 213-14, 461 N.E.2d 941, 943.

The defendant was arrested for obstruction of a peace officer.

> "A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer of any authorized act within his official capacity commits a Class A misdemeanor." Ill. Rev. Stat. 1989, ch. 38, par. 31—1.

■ A review of the record shows that the defendant crossed the yellow police line of his own accord and was 50 to 150 yards within the line when spotted by the officers. This occurred at a time when the police were conducting an authorized investigation of the crime-scene area. The defendant's intrusion threatened to destroy possible evidence of the alleged crime. The defendant's disregard for the police tape, his initial failure to stop when approached by an identified police officer, his inability to identify himself or explain his presence, his supplying of false information to the police, and his evasiveness when further questioned provide "probable cause" for his arrest under the offense of obstructing a peace officer.

This being said, an objective assessment of the officer's actions in light of the facts and circumstances before the officers at that time shows that the police did no more than they were objectively authorized and legally permitted to do.

The "mere pretext" rule has generally been confined to certain narrow circumstances, such as where law enforcement officials follow a suspect, waiting for him to commit some minor offense, then arrest him to collect statements or evidence on an unrelated crime. (*Hattery*, 183 Ill. App. 3d at 813, 539 N.E.2d at 387.) This was not the case here. The mere fact that the defendant was in custody for one charge does not preclude the police from investigating other unrelated charges concerning the defendant. *People v. Evans* (1988), 125 Ill. 2d 50, 72, 530 N.E.2d 1360, 1369.

A trial court's determination on a motion to suppress will not be overturned unless it is manifestly erroneous. (*Hoskins*, 101 Ill. 2d at 212, 461 N.E.2d at 942.) We, therefore, affirm the holding of the trial court on the defendant's motion to quash the arrest.

Next the defendant alleges that the waiver of his *Miranda* rights was not knowingly and intelligently made because his statements were given while he was experiencing delusions symptomatic of paranoid schizophrenia.

Federal constitutional law requires that a defendant's waiver of his *Miranda* rights must at a minimum be "voluntary" to be effective against the accused. (*Colorado v. Connelly* (1986), 479 U.S. 157, 169, 93 L. Ed. 2d 473, 486, 107 S. Ct. 515, 523.) The supreme court of Illinois in *People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958, held that a *Miranda* waiver and resulting confession must be knowing and intelligent as well as constitutionally voluntary in order to be admissible.

The defendant does not dispute that the waiver of his *Miranda* rights was voluntary but instead alleges that it was not knowing and intelligent. Taken separately these terms could present formidable obstacles to obtaining a valid *Miranda* waiver. It could be argued that one never "intelligently" waives his *Miranda* rights in that even an innocent man has little or nothing to gain and may in fact risk much by waiving his rights. "Knowingly," by itself, is also an insufficient term in that one could know a great deal about something without understanding it. Taken together, however, intelligent knowledge can provide a workable standard. To waive one's rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail. (*Bernasco*, 138 Ill. 2d at 363, 562 N.E.2d at 964.) It does not require an understanding of the far-reaching legal effects, or an appreciation of the possible full extent of a subsequent interrogation, or even the ability to withstand the influence of stress or fancy. *Bernasco*, 138 Ill. 2d at 363, 562 N.E.2d at 964.

In reviewing a ruling on a motion to suppress, a reviewing court's analysis is limited to determining whether the suppressing court's finding was against the manifest weight of the evidence. (*People v. Reid* (1990), 136 Ill. 2d 27, 56, 554 N.E.2d 174, 188.) In determining whether a defendant knowingly and intelligently waived his *Miranda* rights, a court must consider the totality of the circumstances including the characteristics of the defendant and the nature of the interrogation. *Reid*, 136 Ill. 2d at 54-55, 554 N.E.2d at 187.

■ While the record contains evidence that the defendant may have been suffering from delusions, hallucinations, and/or paranoia at times, it also indicates that the interviewing officers all found the defendant to be rational, responsive, and understanding of his rights. Dr. Cuneo testified that, in his opinion, the defendant was probably delusional at the time he gave his statements. From his interviews with the defendant and a review of the records, he testified that the defendant was floridly psychotic and actively delusional. On cross-examination he admitted the defendant was of average intelligence and was capable of a "voluntary" waiver of his *Miranda* rights. When pressed further by the court, Dr. Cuneo stated that the defendant could "knowingly, intelligently waive a statement. *He understands those rights.*" (Emphasis added.)

This is the issue at hand, the defendant's ability to execute a "knowing and intelligent" waiver of his *Miranda* rights. While it is true that Dr. Cuneo was of the opinion that the defendant was "insane" at the time of the obstruction charge, this is a legal term and ultimately a question of fact. The credibility and weight to be given psychiatric testimony is for the trier of fact to determine. The judge may reject all expert testimony and rely on lay testimony. (*People v. Lamerson* (1989), 190 Ill. App. 3d 52, 60-61, 545 N.E.2d 1025, 1030; see *People v. Williams* (1980), 87 Ill. App. 3d 860, 864, 409 N.E.2d 439, 441.) However, it is unnecessary to reject Dr. Cuneo's testimony. The totality of the circumstances, even considering Dr. Cuneo's testimony, tends to support the trial court's finding that the defendant understood his *Miranda* rights and that he was capable of knowingly and intelligently waiving those rights despite allegedly experiencing delusions symptomatic of paranoid schizophrenia. The record suggests that the defendant had at least a basic understanding of the *Miranda* rights and what a waiver of those rights entailed. The validity of a waiver of rights is essentially a question of fact. (See *Bernasco*, 138 Ill. 2d at 368, 562 N.E.2d at 966.) Thus, the holding of the circuit court that the defendant's waiver of his *Miranda* rights was knowing

and intelligent was not against the manifest weight of the evidence, and we, therefore, affirm on this issue.

The defendant additionally alleges that the trial court erred in considering the testimony of Brett Newton and Linda Armstrong as it was at most only marginally relevant and more prejudicial than probative.

Generally evidence of prior acts may not be introduced to show a propensity to commit crime. (*People v. Lucas* (1989), 132 Ill. 2d 399, 429, 548 N.E.2d 1003, 1014.) However, prior-acts evidence may be admitted to establish a motive theory if it tends to establish the theory. (*People v. Stewart* (1984), 105 Ill. 2d 22, 56, 473 N.E.2d 840, 857.) "Evidence which tends to establish that the accused had a motive for killing the decedent is relevant, and if the evidence, at least to a slight degree, tends to establish the motive relied on, it is also competent." *Lucas*, 132 Ill. 2d at 427, 548 N.E.2d at 1014.

■■ Here, the motive proposed by the State was broad. The defendant had an extensive preoccupation with sex and was plagued by feelings of inadequacy and sexual frustration in his dealings with women. The State's theory was that defendant randomly sought a victim so that he could engage in sexual relations. The testimony of Linda Armstrong tends to establish that the defendant was socially inept and deluded in regard to relationships with women. The testimony of Officer Newton supports the State's proposed theory that Miss Cardenas was a randomly chosen victim, in the wrong place at the wrong time, by demonstrating that on at least one other occasion the defendant had been observed following a young white female, step for step, through a park for a distance of around 150 yards. This evidence tended to establish the motive theory relied upon and was, therefore, relevant.

The defendant argues, also, that the prejudicial effect of the disputed testimonies outweighed their probative value. The probative value of the evidence must outweigh its prejudicial impact. This determination rests within the discretion of the trial court. (*People v. Harris* (1980), 91 Ill. App. 3d 112, 114, 414 N.E.2d 755, 757.) As we are reviewing a bench trial, the prejudicial impact, under the circumstances, may be viewed as minimal and outweighed by its probative value. As such, we find the trial court did not abuse its discretion in admitting the testimony of both Officer Newton and Linda Armstrong and on this issue affirm.

The defendant also alleges that he was not proven guilty beyond a reasonable doubt where the physical evidence was either contrary to or not substantially corroborative of the defendant's statements,

which were themselves unreliable due to the defendant's mental illness.

■ The relevant question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.

The defense characterizes the defendant's description of the body and the state in which it was found as "unexceptional." We cannot agree. The defendant's statements entailing the presence of the pipe, the barrette and the set of keys found under the left hand and describing the basic colors of the victim's clothing and the victim herself cannot be passed off as mere coincidence. We also note that the trial court at the hearing on the post-trial motions characterized the defendant's diagram of the crime scene as: "Telling evidence showing to the fact that this defendant had inner knowledge of this offense and not something he created out of the ramblings of a delusional vagrant ***." Since the defendant has failed to provide this diagram for this court to review, we must presume the trial court's depiction to be accurate, as any doubts arising from an incomplete record must be resolved against the appellant, whose responsibility it is to provide a complete record for review. *People v. Hefley* (1982), 109 Ill. App. 3d 74, 76, 440 N.E.2d 173, 176.

The evidence suggested that Audrey Cardenas had been sexually assaulted and that the defendant was a man of bizarre sexual obsessions and frustrations and a man who admittedly would rape a woman "if she would not give it up voluntarily."

The cases cited by defendant are easily distinguishable since in neither of those cases did the defendant confess to the crime (*People v. Queen* (1985), 130 Ill. App. 3d 523, 474 N.E.2d 786; *People v. Holsapple* (1975), 30 Ill. App. 3d 976, 333 N.E.2d 683), while Woidtke gave several confessions.

The inaccuracies or distortions contained in the defendant's statements, such as the suggestion of high heels or tattoos on the victim's body, can easily be attributed to the defendant's deluded sexual fantasies. They do not, however, negate the fact that the defendant's confessions contained ample information unlikely to be known by anyone but the perpetrator himself. All this evidence tends to establish that the defendant's confessions, however deluded or distorted, were not false.

When presented with a challenge to the sufficiency of evidence, it is not the function of a reviewing court to retry the defendant. (*Col-*

*lins*, 106 Ill. 2d at 261, 478 N.E.2d at 920.) Thus, after viewing the evidence in a light most favorable to the prosecution, we cannot say that any rational trier of fact could not have found the essential elements of the crime proved beyond a reasonable doubt. We, therefore, affirm on this issue.

Finally, the defendant claims that he is entitled to a new sentencing hearing because the trial court considered an improper aggravating factor, the death of the victim, in pronouncing sentence. Alternatively, the defendant alleges that his sentence must be reduced where the trial court supported its sentence with unsubstantiated conclusions from the evidence at trial.

While it may be improper, in sentencing for the offense of murder, for the court to consider as an aggravating factor that the defendant's conduct caused harm (*People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138; *People v. Pollard* (1986), 149 Ill. App. 3d 434, 500 N.E.2d 971), reliance on an improper factor in aggravation does not always necessitate remandment for resentencing (*People v. Bourke* (1983), 96 Ill. 2d 327, 332, 449 N.E.2d 1338, 1340). Where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required. *Bourke*, 96 Ill. 2d at 332, 449 N.E.2d at 1340.

■ The trial court mentioned only once that it had considered harm as a factor in aggravation, while remarking on the serious threat the defendant posed to the public four times. The court also mentioned that defendant showed no mercy to the victim. In mitigation the court cited the defendant's mental health, absence of any significant prior criminal history and the failure of the system in preventing the offense. It should also be noted that defendant's sentence of 45 years' imprisonment is substantially below the maximum sentence of 60 years that was available. (See *Bourke*, 96 Ill. 2d at 333, 449 N.E.2d at 1341.) We find that the record indicates that the court based its sentence primarily on the serious threat the defendant posed to the public and that the aggravating factor of harm was so insignificant that it did not lead to a greater sentence.

The defendant's argument, in the alternative, that the court supported the sentence imposed with unsubstantiated conclusions from the evidence at trial is also without merit. First, the court made no remarks concerning the testimony of Officer Newton or Linda Armstrong in sentencing. Second, the defendant's own acknowledgement that when he left, the victim was still alive, when combined with the evidence showing the victim's body was found in a ditch, unclothed,

abused, and apparently left to die, completely substantiated the court's statement that the defendant showed no mercy to the victim.

The suggestion that the court considered the defendant's mental health as an aggravating factor is incorrect. The court plainly stated that the maximum sentence of 60 years' imprisonment was not called for due to the mitigation of mental illness. The court's reference to evidence indicating the victim may not have died had the defendant not been released from Alton State Hospital by a prior judicial act was an obvious indictment of the system rather than a factor considered in aggravation.

We, therefore, find the trial court did not abuse its discretion in pronouncing sentence, nor was the sentence imposed because of improper evidence.

Affirmed.

HARRISON and HOWERTON, JJ., concur.